678 P.2d 19

Robert Michael **MALLERY**, Dean A. Schwartzmiller, Landis Dillard, Jr., Dale G. Goss, Jesse S. Gonzales and Randy Wise, Petitioners-Appellants,

v.

**G.D. LEWIS**, sergeant, Canyon County Sheriff's Office, and John D. Prescott, Sheriff of Canyon County, Respondents.

No. 14300.

Supreme Court of Idaho.

Oct. 24, 1983.

Rehearing Denied March 9, 1984.

one of the five cell areas contain a shower and showers were provided to those locked in the other four areas at the whim of respondents. Petitioners alleged all correspondence, incoming and outgoing, was censored by respondents and in some instances copied to be used in criminal actions. Mail was withheld without notice to prisoners. Petitioners allege they were denied access to the courts in that the Canyon County jail has no law library; the petitioners were allowed virtually no phone calls to their court-appointed attorneys or the various courts of the state. Petitioners alleged the policy of the jail restricting visits to members of the immediate family is a deprivation of their first amendment right of association. Petitioners allege they were provided no recreation or exercise, there were inadequate hygiene supplies, and there was inadequate health care.

Following a hearing on the merits, the trial court denied petitioners' request for relief after encouraging the sheriff to change certain practices.

The issues presented on appeal are (1) whether the conditions in the Canyon County jail result in a deprivation of constitutional rights; and (2) whether appellants have standing to maintain this action.

■■■ The proper focus of inquiry into the constitutionality of conditions or restrictions of pretrial detention was set forth by the United States Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); that is, whether the conditions amount to punishment of the detainee. Under the due process clause, a detainee may not be punished prior to an adjudication of guilt. The courts must determine whether the condition or restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. In *Bell, supra*, 99 S.Ct. at 1873, the court stated:

> "The factors identified in [*Kennedy v.*] *Mendoza-Martinez* [372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)] provide useful guideposts in determining whether particular restrictions and conditions

Howard A. Belodoff, Boise, for petitioners-appellants.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, Mark Shuster, Deputy Atty. Gen., Coeur d'Alene, for respondents.

HUNTLEY, Justice.

Petitioners were pretrial detainees in the Canyon County jail at the time they filed a petition for writ of habeas corpus alleging deprivation of constitutional rights guaranteed by the United States and Idaho constitutions. Petitioners alleged their cells were overcrowded and that the living space per inmate was insufficient to meet constitutional minimum requirements. On occasion, after deducting the space occupied by bunks, there remained less than 5½ square feet of floor space per person. Prisoners were made to remain in those small areas for more than 72 hours at one time; only

accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. See *Flemming v. Nestor, supra,* 363 U.S. [603] at 613–617, 80 S.Ct. [1367] at 1374–1376 [4 L.Ed.2d 1435 (1960)]. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' *Kennedy v. Mendoza-Martinez,* 372 U.S., at 168–169, 83 S.Ct. at 567–568; see *Flemming v. Nestor, supra,* 363 U.S. at 617, 80 S.Ct. at 1376. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. See *ibid.* Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility. Cf. *United States v. Lovasco,* 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977); *United States v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973)."

■ The court in *Bell, supra,* also noted that the primary purpose of pretrial detention is to assure the defendant's presence at trial, but the government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. The court held that

"Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Bell v. Wolfish,* 99 S.Ct. at 1874.

We turn now to the specific allegations of the petitioners.

OVERCROWDING

Adult pre-trial detainees at Canyon County jail are housed primarily in the fourth floor bullpen area in five cells. Four of the cells have a total floor space of ninety-six square feet each and the fifth has a total floor area of one-hundred sixty-eight square feet. Three of the smaller cells are furnished with six wall-mounted bunks in double tiers, a sink with hot and cold water, and a toilet. The fourth of the smaller cells and the largest cell are the same with the exception of having five instead of the six bunks. None of the smaller cells have a shower. The inmates are allowed out of their cells for a period of one to two hours per day, weekdays, for showers and recreation in the day room. They are also allowed out for visits, phone calls, attorney consultations, and trips to the dentist, doctor or court.

Each cell has at least one window with a gridded screen which permits sunlight and affords the inmates a view of the sky, but not of the ground. The cells are bright and clean, well ventilated, free of insects and rodents, and are open to view at all times. Depending on the number of pretrial detainees in custody, the number of inmates per cell varies from one to six.

Many federal courts have considered conditions of overcrowding at prisons and jails. The courts have considered the length of detentions, the number of hours per day the inmates are confined to their cells, the number of persons confined to each cell, the rated capacity of the facility, whether the population exceeds that capacity and if so whether the excess is temporary or permanent.

In the cases granting relief, the prisons or jails were grossly overcrowded. In *Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir.1981) the court disapproved of the conditions, finding that:

"In the daytime, prisoners were confined to the day room in such numbers that at times there was little more than six square feet per inmate. The west bull-pen held eighteen inmates (in three six-bunk cells), and had only eleven square feet per person, including space occupied by tables. Conditions in the east bull-pen, which held thirty inmates (five six-bunk cells), were worse and sometimes during the day there was only 6.8 square feet of space per person, including table space .... Prisoners often slept on mattresses laid on the floor or on tables in the day room."

In *Capps v. Atiyeh,* 495 F.Supp. 802 (Or. 1980), prisoners were required to sleep on the floor, dayrooms were converted into dormitories, extra beds were placed in the dormatories, all resulting in a situation where the prisoners were "packed to the rafters." The average prisoner was required to spend eleven hours per day in his cell in the summer and twelve and one-half hours per day in the winter. The court in *Capps, supra,* stated that the cell space accorded inmates fell far below the recommended area by professional standards. (The August, 1977, standards of the American Correctional Association require that 60 square feet of cell space be accorded prisoners spending no more than ten hours per day in their cells, and that eighty square feet of cell space be accorded prisoners spending more than ten hours per day in their cells.) The court in *Capps, supra,* in holding the crowding constitutes cruel and unusual punishment, stated the following factors are to be considered:

"(1) the duration of the prisoners' confinement; (2) the degree to which the population exceeds the institution's design capacity; (3) the size of the inmates' quarters and the number of hours per day the inmates must spend in those quarters; (4) the effects of the increased population on the prisoners' mental and physical health; and (5) the relative permanency of the crowded conditions."

Detainees at the Canyon County jail spend approximately twenty-two to twenty-three hours per day in their cells. The number of detainees in each cell fluctuates from one to six. When five persons are housed in the smaller cell the floor space per person is nineteen feet and at six persons it is sixteen square feet. When the space taken up by the six bunks is deducted the result is three to four square feet of living space per person, less than one fourth the space required by the American Correctional Association standard.

The district court held that while this amount of space may be sufficient while sleeping, it is inadequate while the detainees are awake. The court, while not finding that the overcrowding of the smaller cells was punitive in nature, advised that the confinement of more than two inmates in the smaller cells should be limited and if it were necessary to confine more than two in the cell the respondents should consider allowing the detainees out of their cells for longer periods of time.

Petitioners, at the time the petition was filed, had been confined from 30 to 307 days, an average of 135 days per person. There was evidence that the conditions resulted in increased violence and sexual harrassment.

■ We hold that the conditions of crowding which existed in the Canyon County Jail at the time this action was initiated did in fact fail to meet reasonable standards. However, since the trial court did order remedial action eliminating the overcrowding, no ground for granting habeas corpus remains.

We direct the district court to periodically monitor the subject practice to insure that the remedial action it ordered is being continued in effect.

MAIL

Petitioners allege that all correspondence is opened and censored by the jail officials and that mail is withheld without notice to

the detainee. The trial court found that the inmates' general correspondence, incoming and outgoing, is screened by officials, *i.e.*, read for basic content and the envelope checked for contraband. Incoming privileged mail is opened in the presence of the inmate and checked for contraband. Outgoing privileged mail is sealed and not screened. When booked into the jail, prisoners are asked to sign a consent form consenting to the screening of general correspondence. If the form is not signed, the mail is not screened but rather is held until the inmate's release.

In *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), the court held that security and governmental interest justifies the imposition of certain restraints on inmate correspondence. Such interference was held to be justified if the regulation or practice in question furthers an important or substantial governmental interest such as security, order, or rehabilitation. *Procunier, supra,* held that the limitations of first amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. *Id.* at 413, 94 S.Ct. at 1811.

 It is clear that the screening of mail for escape plans, obscene material, violation of prison rules, and contraband furthers a substantial governmental interest. The district court noted some isolated incidents of failure to notify the inmate when his mail was withheld but did not find the failure to amount to constitutional deprivation. Notification of withheld mail must be given to the inmate in the future.

Petitioners' primary complaint with the mail policies was the prohibition of receipt of "sexually provocative" material, particularly magazines such as *Penthouse* and *Playboy* and correspondence from several "lonely hearts" clubs. Petitioners contend that while the jail may prohibit obscene materials its mail policies are overbroad resulting in the banning of materials which are not obscene. *Guajardo v. Estelle,* 580 F.2d 748, 761 (5th Cir.1978), dealt with a similar situation:

"Adoption of [the rule that only materials declared judicially to be obscene may be banned] would merely state a truism since the Supreme Court has categorically settled that obscenity is outside the first amendment's protections. [Citations omitted.] Other circuits have noted that prison officials may deny prisoners access to materials that are not obscene. *Aikens v. Jenkins,* 534 F.2d 751 (7th Cir.1976). We think such a rule is mandated by the prison environment. The first amendment rights of the prisoners cannot be evaluated without reference to that environment and to the type of audience it involves."

As in *Guajardo,* here there was testimony of nonconsensual homosexual conduct. The stimulation that may come from "sexually provocative" material may result in further criminal activity.

 Before delivery of a publication may be refused, jail administrators must review the particular publication in question and make a specific, factual determination that the publication is detrimental to prisoner rehabilitation because it would encourage deviate, criminal sexual behavior. Prisoners must, of course, be allowed to appeal that decision through proper administrative channels. We have reviewed the items admitted into evidence which were withheld because they were "sexually provacative." We conclude that the jail administrators exercised proper discretion in determining that distribution of the subject materials would be detrimental to operation of the facility.

## VISITATION

 Pretrial detainees are allowed non-contact visits from their immediate family twice a week from 12:00 to 2:00 p.m. Each detainee is allowed to visit for thirty minutes each visiting day. Respondents assert this restriction is mandated by staffing limitations and the need to accommodate all family members appearing on a given day.

*Jones v. Diamond,* 594 F.2d 997, 1013 (5th Cir.1979), addressed this issue: [1]

"In the absence of such overpowering considerations as a threat to jail security, if a jailer were to refuse to allow the *ordinary* detainee any visitation privileges, or if he were to lay down arbitrary or capricious limitations on the privilege, such conduct would be unconstitutional, *Procunier v. Martinez,* 416 U.S. 396, 411, 412, 94 S.Ct. 1800 [1810, 1811], 40 L.Ed.2d 224 (1974). The true rule is that the jailer must decide how many hours a week visits are feasible, considering the physical limitations of the jail and the reasonable internal and external needs of the facility, *see Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Visitation privileges for ordinary detainees should be set forth in written rules in order that the detainees may understand them and so that the courts may have a definite basis for review in the face of claimed arbitrariness and capriciousness." (Emphasis in original.)

The visitation rules at Canyon County jail are applied equally to all detainees and there was no evidence that they were being applied arbitrarily or capriciously and thus petitioners' complaints in this regard are without merit.

### ACCESS TO THE COURTS

Petitioners assert they were denied access to the courts because the Canyon County jail did not provide them access to a law library nor an attorney to represent them in civil matters. Further, the jail did not provide paper, pens and legal pads, copying machines or typewriters. The trial court held that since petitioners were represented by counsel in their criminal cases they did not require access to a law library. Additionally, the court noted that these particular detainees were not denied access since petitioner Schwartzmiller's criminal attorney had provided him with one-hundred nineteen law books and there was no evidence petitioners' pleadings or other documents were not filed or sent to the court in a reasonably prompt manner. The trial court correctly found there was no evidence of lack of supplies.

In *Leeds v. Watson,* 630 F.2d 674 (9th Cir.1980), the court held that prisoners in the Kootenai jail were denied meaningful access to the courts. There was no law library at the Kootenai jail and access to the county library required an order of court permitting use of the library only when accompanied by a guard. The court held that the availability of public defenders did not satisfy the *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), requirement:

"[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."

█ It is the policy of the Canyon County jail to deny a detainee direct access to the county law library and provide books only if he can prevail upon his criminal attorney to procure and deliver them. *Bounds* made clear that there is no absolute right to a law library, if an alternative means is provided, either by the use of paralegals or paraprofessionals. The sheriff is directed to explore and provide alternative methods of meaningful access to the courts for detainees. The fact, alone, that a detainee is represented in his criminal action, is insufficient to fulfill this constitutional right.

Petitioners encountered difficulty in filing certain papers with the courts of Canyon County. The papers were finally forwarded to the court by the criminal attorney of one of the petitioners because the jailers did not forward or deliver them. Additionally, two subpoenas requested by petitioners were not served and no reason was given as to why they were not served.

---

**1.** *Jones v. Diamond,* 636 F.2d 1364 (5th Cir. 1981), concerned only standards for "contact" visits which are not in issue here.

■ The legal papers finally having been filed by a petitioners' attorney, and the evidence which the witnesses would have testified to having been admitted in another form, harmless error resulted. However, the refusal or failure of jail officials to file the papers and deliver subpoenas is a denial of a prisoner's right to access to the courts and such refusal is strongly disapproved.

We have examined petitioners' remaining allegations in support of issuance of a writ of habeas corpus and find them to be without merit.

■ Respondents contend petitioners have no standing and that this case is moot because the petitioners are no longer incarcerated in the Canyon County jail. This case falls into one of the exceptions to the mootness doctrine in that it is a case "capable of repetition, yet evading review." *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Pretrial detainees are held at the Canyon County jail for an average of six to eight months. Absent the applicability of this exception to the mootness doctrine, it is clear that pretrial detainees would not be afforded appellate review. Therefore, we have reached the merits of the case.

The decision of the district court is affirmed. Writ of habeas corpus is denied.

DONALDSON, C.J., concurs.

SHEPARD and BAKES, JJ., concur in the result.

BISTLINE, Justice, concurring in part and dissenting in part.

The effort invested in this inquiry by the district judge, as well as the obvious concern underlying much of Justice Huntley's majority opinion, should be well received by the citizens of Idaho. Much of that which Justice Huntley has written will serve a beneficial purpose. However, there is also much in both the style and substance of the opinion with which I cannot agree, and therefore I feel compelled to state my views separately.

A beginning point is to consider the response proffered by both the majority and the trial court to the specific allegations raised by petitioners. Both the district court and the majority found that the overcrowding in the Canyon County jail was excessive. There was evidence to the fact, as the majority notes, that the grossly overcrowded conditions resulted in increased violence and sexual harassment. The cells were so overcrowded that, at times, the inmates were limited to three to four square feet of living space per person. Moreover, prisoners were made to stay in these cells for at least twenty-three hours a day and more than seventy-two hours at one time. By any standards, constitutional or otherwise, these conditions are despicable and must be remedied. We are not dealing with the keeping of animals, nor are we dealing with persons convicted. Our concern is whether the people of this state can pen like livestock other people of this state who have been charged with running afoul of the law, affording them less of humanity than those who have been tried and convicted. For those who are found innocent there is no redress for their having for long periods of time been cooped like chickens and afforded the same right to cleanliness as pigs in a pen.

The majority seems in part to have depended upon the district court's finding that the overcrowding of the smaller cells was not designedly punitive in nature, and thus, on that slim reed, not unconstitutional as to pre-trial detainees under *Bell v. Wolfish.* However, as petitioner points out in his brief:

"The court misconstrued the legal standards for reviewing unconstitutional jail conditions. The actual intentions or motives of jail officials [are] irrelevant to the court's inquiry in cases merely challenging conditions as opposed to money damages. The court may infer unconstitutional punishment without a finding of intent strictly by the punitive nature of the confinement in the jail if the 'restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or

purposeless.' *Bell v. Wolfish, supra,* [441 U.S.] at 539 [99 S.Ct. at 1874]." However, even in refusing to find a constitutional violation because the overcrowding was not "designedly punitive" in nature—a fact mistakenly believed by the district court to be dispositive—the court nevertheless published its disapproval of the overcrowded conditions:

"[T]he Court does feel compelled to *draw the respondents' attention* to the *possible future necessity* of utilizing the largest of the bull-pen cells to its fullest design capacity, consistent with security, health, and safety consideration. This would relieve the closeness caused by multiple bunking in the smaller cells. When, and if, it should become necessary to house more than two inmates in one of the small bull-pen cells, *respondent might be well-advised* to permit those inmates to leave their cells for longer periods of time each day, and up to six days a week in order to avoid constitutional problems. Moreover, any necessary multiple (more than two) bunking in those smaller cells *should be* kept to the very minimum of time possible. And, in the interests of being able to *justify* their management decisions *respondents might be well advised* to document in writing the necessity, if it ever exists, of multiple bunking in the small cells."

Trial Court Memorandum Decision, p. 7 (emphasis added).

This is the so-called "remedial action" said to have been "ordered" by the district court which the majority opinion today affirms in language as equally precatory as that used by the district court. The general tenor of the majority opinion is that of a parishioner's review of a Sunday sermon. I am unable to approve of the extremely tentative and reluctant fashion in which both the district court and majority have addressed the very serious question at issue here.

Everyone seems to agree that the conditions at Canyon County jail are unacceptable and repugnant to the United States Constitution, yet no one appears willing or able to fashion an effective remedy. The following excerpt from petitioner's brief is especially germane in this regard, successfully homing in on the unwillingness of the courts to assume any real responsibility in this instance:

"Throughout the district court's Memorandum Decision there are references to various deficiencies in the Canyon County Jail. The court was convinced that housing 'more than two pretrial' detainees in cells B, C, E, and F was 'insufficient' for non-sleeping purposes. Memorandum Decision, p. 12. Yet, the court refused to grant an order relieving the severely overcrowded conditions. Instead it 'advised' the Respondents 'to permit those inmates to leave their cells for longer periods of time each day and up to six days a week in order to avoid constitutional problems.' Memorandum Decision, R., p. 63. The court further advised the Respondents to minimize the 'multiple bunking in the small cells' and 'to justify their management decisions ... in writing.' Memorandum Decision, R. p. 63. These remarks present interesting questions that should be answered. To whom do the Respondents have to justify the overcrowded conditions when the court, which is sworn to uphold the Constitutions and laws of the State of Idaho and the United States, finds constitutionally questionable conditions and practice, but chooses to ignore them since the court could not say 'that the Respondents have not acted in good faith.' Unless the arrest and confinement of pretrial detainees was halved, the overcrowding at the Canyon County Jail would have to continue. The possibility exists that the conditions are even worse today and will worsen in the future because the jail facility is underfunded, inadequately staffed and obsolete."

This assessment, that the actions of the district court are wholly inadequate, is both accurate and prophetic. Such precatory words as "might" and "should," as mentioned in the excerpt, and also the overworked phrase "would be well advised to,"

**236**

provide neither affirmative direction nor remedy to a concededly dismal situation.

Nevertheless, it is clear that the district judge did give much time, effort, and consideration to the situation as it presently exists at Canyon County jail. But that is not the end of it. Nor should it be. The cause which the district judge has thus far so nobly advanced ought not go for naught. There should be some profit derived from a considerable expenditure of time, rather than the mildly chiding rebuke which has been administered by the Idaho judiciary. Because it seems to be generally well-known that this Court has in recent years committed itself to a policy of abstinence in penal affairs, *i.e.*, review of sentences and any kind of supervision of jails and prisons, most practitioners and other aware citizens may well surmise that the district judge went as far as he did go with a jaundiced eye cast upward. Given any encouragement from this Court, I submit that the district judge would indeed have *ordered* corrective action, and would have retained jurisdiction of the controversy to insure that his orders were carried out—maintaining a vigilant watch over the progress made at alleviating the conditions at the jail. Perhaps this is what the majority contemplates in directing "the district court to periodically monitor the subject practice to insure that the remedial action it ordered is being continued in effect." *Supra*, p. 23. Unfortunately, it is to be noted that there were in fact no orders made, and no retention of jurisdiction. (Perhaps it was thought that the district judge would visit the jail from time to time.). The district judge should outright order the changes necessary to bring the conditions at the jail up to constitutional standards and should further provide a mechanism for enforcing such order, and the district court should be told forthrightly that to do so is within its authority. Thus, this Court does not this day do, notwithstanding that the trial court made clear the reasons for its reluctance in ordering that the necessary changes be made. Memorandum Decision, R., pp. 5, 7. In addition to concerns of judicial restraint, which are indeed proper in a proper case,

the court pointed to lack of funds provided by the legislature to the counties:

"Once again this Court is faced with a thorny constitutional issue because of, or partially so, the practice of the Idaho legislature in mandating procedures to the Counties and local governments without providing funding assistance. The Court has considered the issue with regard to forced participation in the health district programs, forced compliance with practices to aid the handicapped, forced medical indigency payments, and forced juvenile detention requirements. Again, as before, the Court voices no great concern with the merits of the statutory programs, but with the practice of requiring participation in them without advancing financial assistance to the levels of government charged with implementation. The issue seems to intensify its impact upon the property tax-payers in the Counties when we learn that the state retains a fund surplus of 1.7 million dollars, yet continues its practice of forcing local compliance without extending complementary funding."

Memorandum Decision, p. 7, n. 1.

No one can say that the district court's appraisal of the problem is inaccurate. But, is this a proper justification for judicial abdication? I would hope not. Though it is no doubt true that a court does not have the "authority to require all expenditures which would make a jail a model prison," it nonetheless has the constitutional power and responsibility to insure that those correctional facilities which do exist meet constitutional minimums. As Circuit Court of Appeals Judge Blackmun wrote: "Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar consideration." *Jackson v. Bishop*, 404 F.2d 571, 580 (8th Cir.1968).

While it is the province of the legislature to appropriate monies for the public weal, it is just as clearly the place of the courts to insure that the mandates of the state and federal constitutions are not allowed to go unheeded. Where the legislature is

brought to the realization that its priorities must include the maintenance of constitutionally acceptable jails, and yet fails to act, then it must come to grips with the consequences of its indecision. It may perhaps look to its recently enacted bailjumping statute, I.C. § 18–7401, making it an offense to fail to appear at the appointed time after having been set at liberty by the court. Since, by hypothesis, the pretrial detainees bringing this action are only in the Canyon County jail by reason of their inability to make their appointed bail and to thereby insure their presence at trial, I.C. § 18–7401 may in most cases provide an acceptable alternative to detention—especially where such detention subjects the detainees to unconstitutional conditions. And, of course, as a last resort the court can order the jail closed if the proper officials balk at allocating funds. *Dimarzo v. Cahill*, 575 F.2d 15, 19–20 (1st Cir.1978). Regardless, the court must carry out its responsibilities irrespective of the way in which the legislature deems it proper to carry out its own responsibilities.

In addition to the problems seen in the *approach* taken by the majority, some of its *conclusions* also are not readily acceptable. First, it must be noted that the majority simply declines to address the total lack of outdoor recreation afforded at the Canyon County jail. The evidence was uncontroverted that the jail does not provide any outdoor exercise, Respondents' Answers to Interrogatories Nos. 15 and 17 and *Anderson*, Tr., p. 194, 11. 5012, and that there was no exercise equipment for use by pretrial detainees. Respondents' Answers to Interrogatories No. 9. Although there was testimony that an area for the purpose of exercise was under construction, no work was being done at the time of trial nor was there a completion date set for it. *Anderson*, Tr., p. 193, 1. 8—p. 194, 1. 4. The trial court contented itself with noting that "petitioners presented no evidence that lack of outdoor exercise

is detrimental to their health," Memorandum Decision, p. 12, and by quoting passages from *Jones v. Diamond*, 594 F.2d 997 (5th Cir.1979).[1] The petitioners apparently deemed this response both extremely cavalier and woefully inadequate.

It is true that there was no evidence presented by petitioners that lack of outdoor exercise was detrimental to their health. I would have thought that such a widely recognized fact, if not capable of being judicially noticed, was at least not needful of being proved. Moreover, "There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well-being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir.1979). In that case, despite the fact that the prisoner-plaintiffs in question were convicted felons in a maximum-security institution—"some of the most dangerous men in the prison population," *Id.* at 192—the Ninth Circuit ruled that outdoor exercise could not be denied, even as a disciplinary measure for violent offenses in prison. *Id.* at 199–200.

Lack of physical exercise endangers the inmates' physical and mental health. It can be considered either as a denial of adequate medical care or as a condition of confinement contributing to a cumulative impact which subjects inmates to cruel and unusual punishment. *See, e.g., Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Concededly there have been cases where evidence was adduced to prove that which everyone knows—the deprivation of outdoor exercise is detrimental. *Martino v. Carey*, 563 F.Supp. 984 (D.Or. 1983). In that United States District case, Judge Redden stated the following:

"In the present case expert witnesses testified that the denial of all outdoor exercise endangered the physical and mental health of prisoners and led to physical and mental deteriorization. I

---

1. *Jones v. Diamond* was substantially reversed by the Fifth Circuit on rehearing en banc. *Jones v. Diamond*, 636 F.2d 1364 (5th Cir.1981) (en banc). The relative closeness of dates suggests that the district court was not made aware of the en banc decision, which went unmentioned.

agree with this testimony and find that the denial of exercise violated the Eighth Amendment as to convicted prisoners and imposed a clearly 'punitive' condition upon pre-trial detainees. *The cases so holding are legion.... Denial of exercise destroys the bodies and minds of inmates, 'without penological justification.'* See *Rhodes v. Chapman, supra."* *Martino v. Carey*, 563 F.Supp. at 1001 (emphasis added).

Doubting that any member of this Court would express himself otherwise, I surmise that the lack of any majority opinion comment on this issue will not be surprising.

I also disagree with both the standard employed and the conclusion reached by the majority on the issue of mail censorship. Clearly, the first amendment governs the permissible extent of such restrictions upon inmates' mail privileges. Though the applicable test for such restrictions on the rights of convicted prisoners was indeed stated by the Supreme Court in *Procunier v. Martinez, supra,* and restated by the Ninth Circuit in *Pepperling v. Crist*, 678 F.2d 787 (9th Cir.1982), a different analysis is required for pre-trial detainees. In Inmates of *San Diego County Jail v. Duffy*, 528 F.2d 954 (9th Cir. 1975), the Ninth Circuit held that such a test developed for convicted prisoners is inapplicable to the rights of pre-trial detainees, who are presumed to be innocent of crime and whose detention is based solely upon inability to make bail. In dealing with just this situation, Judge Redden, in *Martino v. Carey, supra,* stated the following:

"I find that the appropriate test for restrictions upon the First Amendment rights of pretrial detainees is a test which is more sensitive to First Amendment rights than even the highly-protective *Procunier-Pepperling* standard. I apply the standard enunciated by Judge Zirpoli in *Brenneman v. Madigan*, 343 F.Supp. 128, 141–142 (N.D.Cal.1972). Under this standard, pre-trial detainees

are not subject to any regulation which is not 'absolutely necessary to ensure their presence at trial.' *Id.* at 142. Correctional officials seeking to achieve this goal must use 'the least restrictive' method of doing so. *Id.* Under this standard, 'it is difficult to justify any restrictions at all on the amount or content of a pre-trial detainee's outgoing correspondence.' *Id.* at 142."

*Martino v. Carey*, 563 F.Supp. at 1005. It seems clear that under this standard there is no justification for precluding the detainee's receipt of magazines such as Playboy or Penthouse.

In conclusion, then, it cannot be said that the conditions to which the pre-trial detainees are subject at Canyon County jail are not unconstitutional. The district court should be directed to *order* done that which it *wishes* done, and should be directed to retain jurisdiction to the end that the Canyon County jail shall not continue receiving inmates beyond its capacity to accommodate them within constitutional bounds.

Indeed, foreseeable is the day when by the abdication of responsibility exhibited this date by the Idaho judiciary, the federal judiciary will necessarily have to fill the void. For suggested reading, I recommend to my colleagues both the majority and minority opinions in *State v. Coutts*, 101 Idaho 110, 609 P.2d 642 (1980), for an insight into jail conditions in the Boundary County jail, pp. 111 and 119, 609 P.2d 642, and also a view of the conditions in the Kootenai County jail as set forth at p. 119, n. 12, 609 P.2d 642, which are certainly worth the reprinting in connection with evaluating today's inaction by this Court.[2] For an update on the Kootenai County jail, and likely federal activity here, *see Leeds v. Watson*, 630 F.2d 674 (9th Cir.1980).[3]

Although I concur in the majority's opinion on the issue of standing, for the reasons stated above I am unable to join the majority's disposition of the merits, and respectfully dissent therefrom.

---

**2.** See Appendix A attached.

**3.** See Appendix B attached.

## "OVERCROWDING

"The trial judge recognized the fact that the jail was operating at an overcapacity and he enjoined the confining of more than 14 prisoners at once or for more than 48 hours, subject to a list of exceptions. There is nothing in the plan to assure that the 5 exceptions to the 48-hour rule in the court's Order are not being used in a manner that will permit a total disregard of the meaning and intent of the 48-hour limitation rule. Moreover, the record before us does not reflect whether any of the promised improvements to health and sanitation problems have been implemented.

. . . .

## "ACCESS TO THE COURTS

. . . Appellees further point to the availability of Public Defenders as satisfaction of the *Bounds* alternative requirement. However, the parties stipulated (Tr. 417) that Idaho Legal Aid Services does not have the staff to provide legal representation to inmates at the Kootenai jail in all the cases in which they are requested to do so, but have represented inmates three times in the past four years. 'Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid.' *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974).

"We reverse the finding that there was no violation of the prisoners' constitutional right of access to the courts. On remand, a determination of the adequacy of legal representation to inmates, or in the alternative, the provision of an adequate law library and notice of its availability should be explored."
630 F.2d at 676.

## APPENDIX B

"Recently an order issued out of the U.S. District Court for the District of Idaho condemning the conditions at the Kootenai County Jail, and giving the commissioners of that county directions that prisoners not be kept therein longer than 48 hours. Among the findings and conclusions of that court were the following:

" 'The toilets, showers, and general conditions of the cells of the Kootenai County Jail are unsanitary and inadequate for the confinement of prisoners for other than very short periods of time.

. . . .

" 'The conditions of confinement for pretrial detainees in the Kootenai County Jail are substantially worse than conditions of confinement for convicted felons confined in the Idaho State Penitentiary.

" 'The totality of conditions in the Kootenai County Jail render the facilities constitutionally unacceptable for confinement. Such confinement constitutes cruel and unusual punishment in violation of prisoners' rights protected by the Eighth and Fourteenth Amendments to the United States Constitution.

" 'Confining pretrial detainees in the Kootenai County Jail in conditions substantially worse than the conditions of confinement for convicted felons in the Idaho State Penitentiary, and in the conditions found by the Court, violates pretrial detainees' rights to due process of law and equal protection which are guaranteed by the Fourteenth Amendment to the United States constitution.' "
101 Idaho at 119, n. 12, 609 P.2d at 651, n. 12.

## ON DENIAL OF PETITION FOR REHEARING

HUNTLEY, Justice.

In our decision of October 24, 1983 we noted that the minimum floor space per inmate approved by the standards of the American Correctional Association is sixty square feet of cell space for a prisoner spending no more than ten hours per day in his cell. Eighty (80) square feet is required if the confinement is more than ten hours per day.

We further noted that the practice in Canyon County *prior* to the district court order was to house five or six detainees in a cell, resulting in only nineteen or sixteen square feet per person, and that when the space occupied by bunks was deducted there remained only four or three square feet per person.

In our October decision we declined to order habeas corpus or other affirmative action on the basis that it was represented to us that the district court's order alleviating the situation, both as to overcrowding, lack of opportunity for showers, and lack of adequate exercise was being complied with.

On petition for rehearing we have been presented with affidavits which, if true in their allegations, demonstrate that not only is the district court's order not being complied with, but rather that the conditions have worsened.

The affidavits are summarized:

(1) *Ronald Carter:*

(a) Detained more than three months in Cell A.

(b) Minimum of five and usually six detainees in cell

(c) Six bunks have been *added* to Cell D.

(d) Total confinement in cells from Friday morning to Monday morning, and one additional day more confinement on holiday weekends.

(2) *Ken Budell:*

(a) Detained two and one-half months in Cells D, E and F.

(b) Minimum of five and usually six in his cell. (The district court ordered that no more than two be detained in the cell except during sleeping hours.)

(c) Neither enough time nor enough hot water for adequate showers.

(d) Total confinement over for periods stated in Carter affidavit.

(3) *Wayne A. Byerly:*

(a) Detained approximately seven months.

(b) During entire period five or six persons in the cells where the court ordered maximum of two.

(c) Inadequate shower opportunity.

(d) Inmate Rick Garcia stated he attempted suicide several times while Byerly there.

(e) Ill with high fever and no medical attention for eight days.

(4) *Bert Miyoshi:*

(a) Detained seventeen days in Cell F.

(b) Always five to six persons in cell (where court ordered two).

(c) Only exercise was walking in dayroom.

(d) During the seventeen-day period saw two detainees in Cell C and one in Cell B being forced to sleep on mattress on floor because the six bunks were occupied.

(e) Notified by jailer that letter from wife being withheld—no opportunity to challenge the withholding and did not receive the letter until the day discharged.

These matters, if true, indicate both a violation of the mandates of the trial court and a constitutionally impermissible manner of housing pretrial detainees.

Since there may well be an explanation for or refutation of these allegations, it would be improper for this court to act on the basis of incomplete information, especially when these matters have never been presented to the trial court.

The proper procedure would require initiation of new action if in fact the standards enunciated in our original decision are not being complied with.

Petition for rehearing denied. No costs awarded.

DONALDSON, C.J., and BAKES and BISTLINE, JJ., concur.

SHEPARD, J., concurs only in the denial of the Petition for Rehearing.

BISTLINE, Justice, specially concurring.

Consistent with my earlier expressed views, I would prefer that the district court

be directed to retain jurisdiction; thereby the matters sought to be considered here by the petition for rehearing can be properly dealt with.